**L. D. MURPHY, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 36665.**

Court of Criminal Appeals of Texas.

April 29, 1964.

Fred Erisman, Longview, Jim D. Bowmer, Bob Burleson, Skelton, Bowmer, Courtney & Burleson, Temple (on appeal only), for appellant.

J. O. Duncan, Dist. Atty., Gilmer, Waggoner Carr, Atty. Gen., Austin, Cecil C. Rotsch, Robert Flowers and Robert O. Smith, Asst. Atty. Gens., Austin, and Leon B. Douglas, State's Atty., Austin, for the State.

MORRISON, Judge.

The offense is the substantive offense of conspiring with one E. W. Scates to bribe Mathews to induce him to conduct a false inclination survey on a certain oil well located on the Adkins lease; the punishment, two years.

The facts stated most favorably from the State's standpoint are as follows: Robert Mathews, an employee of the Texas Railroad Commission who worked under the supervision of appellant, the District Engineer for the Commission, testified that appellant approached him during December of 1961 or January of 1962, and told him that he (appellant) had an interest in the Adkins lease, that plans were afoot to drill a well on such lease, that he intended to call on the witness to make an inclination survey on the well and "that he might need my help on the survey. And he said that I needn't worry, Jelly Scates would talk to some other people that were interested in the well and that they would have to put their hands in their hip pocket." Jelly Scates was shown to be the same person as E. W. Scates. Mathews' further testimony will be summarized as follows: Sometime thereafter and prior to going upon the lease, he and appellant got together and by using the Totco instrument prepared a false set of charts which made it appear that a well was within the inclination permissible under Railroad Commission rules. He stated that he understood that these charts were to be used to reflect the Adkins well inclination. Later appellant told Mathews that Scates had called and they were ready to run the test and gave him the set of charts which they had prepared and told him to use them in a certain order. On February 12, 1962, he met Railroad Commission employee Logan at the Adkins lease, and they went through the motions of making a test. Logan was performing a function in connection with such tests which required him to be some distance away from the Totco instrument, and it was possible for Mathews to make a substitution of the chart which he and appellant had previously made without Logan's knowledge. When Mathews arrived at the Adkins lease, Scates, who was present, reached in his pocket and gave him some money which he later determined amounted to one thousand dollars. Upon his return to the Commission office in Kilgore, Mathews delivered the false set of charts to appellant. The reports he made from such charts later found their way to the Railroad Commission files in Austin. His explanation for his conduct was that Scates had paid him, and appellant had told him to do so. A few days later appellant told Mathews that Railroad Commissioner Bill Murray had raised some question about the Adkins well and that it would be necessary for them to make another test, which they would do as soon as Scates told him to do so. Thereafter, Mathews and appellant prepared another set of false inclination charts, and on February 21, he and appellant went to the Adkins lease and again went through the motion of running a test, but again substituted the false charts which they had previously made. At this time Mathews performed the function which Logan had in the previous test, and appellant was in charge of the Totco instrument. Both appellant and Mathews signed the false report the secretary pre-

pared from the charts they submitted to her, and the report was placed in the Railroad Commission vault. Mathews identified this report which had been brought to court by Railroad Commission Supervisor Payne and admitted in evidence.

Subsequently on June 1, 1962, other employees of the Railroad Commission ran an inclination survey on the Adkins well and discovered that the charts which had theretofore been submitted were grossly erroneous. On the following day, the Eastman Oil Well Survey Company at the insistance of the Railroad Commission ran another inclination and a directional survey and found that the charts heretofore mentioned were false and that the well was bottomed off the Adkins lease.

In support of this accomplice witness' testimony that appellant and Scates had conspired to bribe him, the State offered the following evidence:

1. Logan, an admittedly innocent agent, testified that when he met Mathews at the Adkins lease (when the first test was purportedly run), Scates was present and was talking to Mathews. However, Mathews testified that he had received the money prior to Logan's arrival.

2. A letter, shown by handwriting experts to be in the writing of appellant, addressed to "Bill" and signed "Murph", was introduced from the files of the Railroad Commission in Austin and states, "We marked this well again as soon as we returned from Austin * * * the hole he's in now is O.K." A Railroad Commission agent stated that the fact that it was found in the Commission files indicated to him that "Bill" meant Railroad Commissioner Bill Murray and that "Murph" meant appellant. This letter was shown to have come from the same file as the second false inclination survey report on the Adkins well which bore appellant's signature.

3. An account in the Tyler Bank and Trust Company in the name of J. W. Tyner, Trustee, was shown to have been opened some two years prior to the date charged in the indictment. Into this account deposits were made by appellant and Scates, and withdrawals were made to each of them. Some of the withdrawals payable to Scates bore the notation "Adkins" and "For the Adkins", and were dated subsequent to the filing of the false inclination surveys shown above. Some of the withdrawals were obviously for appellant's personal use, such as the purchase of an automobile and $5,000 issued to him in Las Vegas prior to the date charged in the indictment.

4. Checks signed by Scates, dated after he had executed a conveyance of his interest in the Adkins lease, were marked "Adkins: Operating Expense" and "Adkins".

Among many other contentions, appellant forcefully asserts that the evidence is insufficient to corroborate Mathews' testimony that Scates was a co-conspirator with Murphy. He asserts, and rightfully so, that it was necessary for the State to prove the allegations of the indictment, that is, that Murphy conspired with Scates to bribe Mathews. The case more nearly on all fours with the case at bar and upon which the State relies is Carter v. State, 135 Tex. Cr.R. 457, 116 S.W.2d 371. The principal distinction between the cases is that in Carter the main incriminating evidence did not come from an admitted wrong-doer as in the case at bar. The fact that Mathews and Scates were seen together at the well is not sufficient corroboration. Braly v. State, 125 Tex.Cr.R. 374, 68 S.W.2d 504, and Odneal v. State, 117 Tex.Cr.R. 97, 34 S.W.2d 595. Nor would the fact that both Murphy and Scates had an interest in a bank account and that Scates may have paid part of the costs of drilling a well be sufficient corroboration of Mathews' testimony that Murphy and Scates conspired together to bribe him.

The State has failed to meet the requirements of Article 718 Vernon's Ann.C.C.P. and Articles 1622 and 1624 Vernon's Ann. P.C. in that the testimony of the accomplice witness has not been corroborated to show that Scates entered into an agreement with

Murphy to bribe Mathews. The indictment, omitting the formal parts, charged:

"* * * E. W. Scates and L. D. Murhpy, alias Robert V. Jobe, did, then and there unlawfully conspire, combine, confederate, and enter into a positive agreement together and between themselves to unlawfully, wilfully and corruptly bribe Robert W. Mathews * * *"

It must be remembered that this is a conspiracy case and not one for the offense of bribery.

Since the State has failed to corroborate the accomplice witness as to this essential element, the case must be reversed and remanded for another trial. It is so ordered.